IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


S & J TRUCKING CO.,
   Plaintiff,

vs.                 Civ. No. 05-208 ACT/DJS


JOE DAVIDSON, DAVIDSON OIL
COMPANY d/b/a FLYING STAR TRANSPORT,
LLC, a Texas corporation,

   Defendants.


**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

  **THIS MATTER** comes before the Court on a bench trial held on February 6, 2006. The Court having heard the testimony of witnesses and the parties, reviewed the exhibits introduced into evidence, and reviewed the trial briefs and closing arguments submitted with accompanying authorities makes the following Findings of Fact and Conclusions of Law:

  **Findings of Fact.**

  1. Plaintiff, S & J Trucking Co., ("S & J") is a New Mexico Corporation, based in Raton, New Mexico and owned by Steve Webster ("Webster"). S & J is engaged in the oil and gas delivery business.

  2. Defendant, Davidson Oil Company ("Davidson Oil"), is a Texas Corporation based in Amarillo, Texas. Davidson Oil Company is in the oil and gas delivery business. Davidson Oil

1

Company has a wholly owned subsidiary called Flying Star Transportation. Flying Star Transportation is in the business of transporting fuel. Joe T. Davidson ("Davidson") is the President and majority stockholder of Davidson Oil Co.

    3.    During a vacation in Colorado, Davidson saw several fuel transportation trucks belonging to S & J. Davidson make inquiries as to where S & J was located and the type of transportation services offered by S & J.

    4.    On or about February 21, 2000, Webster and Davidson signed a Non-Disclosure and Non-Compete Agreement ("Agreement"). The Agreement was entered into by the parties for the purpose of allowing Davidson to inspect the business records of S & J Trucking while Davidson contemplated purchasing S & J's stock or assets.

The Agreement provides:

> Whereas it is necessary for Davidson to examine certain business records of S & J prior to making a proposal to purchase and the parties desire to protect the business interest of S & J in the event that Davidson does not purchase the stock or assets of S & J.

Now therefore the parties agree as follows:

\*\*\*

> 2. In consideration for the agreement by S & J to allow Davidson to inspect certain business records of S & J, Davidson agrees that none of the information obtained by Davidson from the records of S & J or the fact that S & J is considering a sale of its business shall be disclosed by Davidson and none of such information shall be used by Davidson for the purpose of competing with S & J in the established trade of S & J.
>
> 3. Davidson covenants and agrees that it shall not engage in the trucking or oil or gas delivery business to current S & J customers for a period of ten years from the date of this agreement.
>
> 4. The parties have agreed that a breach of the terms of their agreement by Davidson would result in immediate, substantial and irreparable harm and damage to

>S & J and that a reasonable amount of [sic] compensate to S & J for such breach is the sum of $250,000.00. Therefore, should Davidson substantially and materially breach the terms of this agreement, Davidson agrees immediately upon demand to pay to S & J the sum of $250,000.00 in liquidated damages.

5. At the time he signed the Agreement, Davidson thought that liquidated damages in the amount of $250,000 was reasonable.

6. The Agreement further provides that in the event of default, the "non defaulting" party shall have the right to recover attorney's fees and costs incurred in enforcing the terms of the Agreement.

7. After the Agreement was signed Webster provided financial information to Davidson. Included in that information was S & J's: (i) customer list; (ii) rates charged to each customer by destination; (iii) gross monthly sales for each customer; (iv) the volume purchased by each customer; and (v) S & J's balance sheets and net revenues.

8. The financial information provided showed the following: In 1999, Ferrell Gas ("Ferrell") was S & J's second largest propane account. This account generated revenues of approximately $150,000 in the ten months prior to S & J's disclosure to Davidson. With respect to Pendleton Oil & Gas ("Pendleton"), another customer of S & J, S&J received $90,634.00 in revenue for the nine months prior to the disclosure. The net profits of S & J in 2000 was approximately 21%.

9. Davidson and Webster met in Raton, New Mexico and Davidson offered to purchase the assets of S & J for approximately $1.2 million dollars. This offer was to buy all of S & J assets and did not exclude propane.

10. Webster rejected the offer.

11. From January 10, 2001 to January 8, 2002, Davidson, as subcontractor of S & J,

3

hauled propane for Ferrell.

12. In the fall of 2003, Davidson Oil on its own transported propane for Pendleton.

13. In 2004 Davidson Oil on its own transported 30 loads of propane for Ferrell.

14. In 2004, Davidson Oil's gross freight revenue from Ferrell was $56,505.00 and from Pendleton was $34,815.00.

15. On or about August 26, 2004, Davidson purchased eight propane tanks from S & J for $200,000. Prior to the time of the purchase Webster had leased his trucks and tanks to a company called Andrews Transport for insurance purposes. Prior to the sale to Davidson, Webster talked to Greg Pohlmeier, of Andrews Trucking, to make sure Andrews had sufficient propane tanks so that S & J could continue servicing their propane customers after the sale of its eight propane tankers. Under the leasing arrangement with Andrews Transport, customers would call S & J and S & J would then dispatch from Andrews Transport, with S & J receiving a percentage of the revenue based on the fact that Andrews Transport was leasing the tractors used for the delivery from S & J. At the time of Davidson's purchase, four of the propane tankers were located at S & J's business place in Raton, New Mexico. The remaining four were still leased to Andrews Transport.

16. After the sale of its propane tankers to Davidson, S & J remained in the business of transporting propane.

17. In 2005, Davidson Oil's gross freight revenue from Ferrell was $83,576.00.

**Conclusions of Law.**

1. The Court has jurisdiction over the parties and subject matter of this lawsuit.

2. In interpreting the Agreement, the Court applies the "plain meaning" of the Agreement as written. *Christmas v. Cimarron Realty Co.*, 98 N.M. 330, 332, 648 P.2d 788, 790 (1982). The

4

parties disagree as to whether propane is included in the Agreement.  Plaintiff contends that propane is a gas and thus is included in the term "oil and gas."  Defendants contend that propane and gas are separate and distinct terms in the trucking and fuel delivery industry.  The "plain meaning" of the term "oil and gas" includes propane.  Propane, also known as liquidated propane gas, is a gas. *Kasey v. Suburban Gas Heat of Kennewick, Inc.,* 60 Wash. 2d 468, 473, 374 P.2d 549, 552 (Wash. 1962) *citing Balthazor v. B & B Supply Co.*, 169 Kan. 188, 217 P.2d 906, 909 (1950) ("Propane" is the name given to liquid which is really natural gas compressed at low temperature."); *Hayes v. Commonwealth of Kentucky*, 2003-SC-0675-MR, 175 S.W. 3d 574, 591 (Ky, 2005) (...propane, [is] a gas commonly used for a number of purposes on farms.") Propane is defined as a hydrocarbon gas used as a fuel.  *Oxford American Dictionary*, Oxford University Press, Inc., 1980 at 536.  Propane is a "hydrocarbon associated with petroleum." 8 H.Williams & C. Meyers, *Oil and Gas Law* 857 (2004).  The Court also notes that the statute governing Liquified and Compressed Gases, which includes propane, NMSA 70-5-1, *et seq.*, is contained in Article 5 of Chapter 70, entitled "Oil and Gas," of the New Mexico statutes.

   3.  Oil and gas as used in the Agreement included the transporting of propane.

   4.  When the Defendants transported propane for Ferrell and Pendleton in 2003, 2004 and 2005, Defendants breached the Agreement.

   5.  Defendants' breach is substantial and material breach.  *Famigleitta v. Ivie-Miller Enterprises, Inc*., 126 N.M. 69, 74, 966 P.2d 777, 782 (Ct. App. 1998) *cert. denied* 126 N.M. 532, 072 P.2d 351 (1998) (a material breach "is one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract").  In this matter the very nature of the Agreement is to protect the business interests of S & J and to prevent Defendants from engaging

5

in competition with S & J. The breach is also substantial based upon the revenues received by S&J from Ferrell and Pendleton.

6. To prevail on a claim for tortious interference with contract S & J must prove: (1) defendant had knowledge of a contract between plaintiff and a third party; (2) performance of the contract was refused; (3) defendant played an active and substantial part in causing plaintiff to lose the benefits of his contract: (4) damages flowed from the breached contract; and (5) defendant induced the breach without justification or privilege to do so. *Ettenson v. Burke*, 2001-NMCA-003, 130 N.M. 67, 74 17 P.3d 440, 446 (Ct. App. 2000) *cert. denied* 130 N.M. 153, 20 P.3d 810 (2001). S & J has failed to prove by a preponderance of the evidence that a contract existed between S & J and Ferrell or Pendleton or the specific damages resulting from the alleged tortious interference. Thus, S & J cannot prevail on this claim.

7. Defendants have not shown that the amount of liquidated damages is a penalty and therefore unenforceable. *Gruschus v. C.R. Davis Contracting Company*, 75 N.M. 649, 409 P.2d 500 (1965) ("As a general rule, enforcement of [a liquidated damages clause] will only be denied when the stipulated amount is so extravagant or disproportionate as to show fraud, mistake or oppression." (citations omitted); *Restatement (Second) of Contracts* § 356 comment b. (the reasonableness of the amount set in a liquidated damages clause is to be looked at as of the time of contracting and at the time of actual breach. If at either time the estimate is reasonable, the clause will be enforced.)

8. All relief requested by the Defendants in their First Amended Counterclaim including Declaratory Judgment and attorney's fees is denied.

9. S & J is awarded liquidated damages in the amount of $250,000.00

10. S & J is awarded attorney's fees and cost pursuant to the terms of the Agreement.

Plaintiff will submit its applications for fees and costs pursuant to the Court's local rules and the Federal Rules of Civil Procedure.

    11.    S & J is awarded post-judgment interest pursuant to 28 U.S.C. § 1961.

    12.    All remaining relief requested by the Plaintiff is denied.

    _____
**ALAN C. TORGERSON**
**UNITED STATES MAGISTRATE JUDGE,**
**PRESIDING**